**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MONDELĒZ GLOBAL LLC and
MONDELEZ CANADA INC.,

Plaintiffs,

v.

PROJECT 7, INC., d/b/a JOYRIDE

Defendant.

No. __________

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**

Plaintiffs Mondelēz Global LLC and Mondelez Canada Inc. (collectively, "Mondelēz"), by their undersigned attorneys, as and for their Complaint against Defendant Project 7, Inc., d/b/a JOYRIDE ("Joyride"), allege as follows:

## INTRODUCTION

**<u>The Candy Playground</u>**

1. Everyone knows SOUR PATCH KIDS. Mischievous, playful, and a little naughty—the kind of kid who might put a whoopee cushion on the new kid's chair, and then turn around and share a snack with her. SOUR PATCH KIDS have been the life of U.S. candy aisles since the 1980s: a kid-shaped candy mascot leaping off vibrant yellow-and-green packaging, instantly recognizable and widely beloved. First they're sour. Then they're sweet. And they belong to Mondelēz, which (along with its predecessors) has spent decades building SOUR PATCH KIDS into the most popular sour chewy candy in America—a pop culture staple so well known, its kid mascot has traveled down New York City streets in the Macy's Thanksgiving Day Parade.



2. Then there's Defendant Joyride—a well-funded, private equity-backed candy company who wasn't making friends on its own. So it stole SOUR PATCH KIDS' popular look, and dared Mondelēz to do something about it. But these KIDS will not be pushed around. To protect its customers and the SOUR PATCH KIDS brand from confusion with Joyride, Mondelēz brings this lawsuit to stop Joyride's intentional and deliberate infringement and dilution of Mondelēz's longstanding and valuable intellectual property rights.

**The Copycat**

3. Defendant Joyride started selling sour chewy candies in around 2020 under the name "Sour Fruit Gummies," using packaging and candy designs plainly distinct from those of SOUR PATCH KIDS. But Joyride's "Sour Fruit Gummies" candy could not compete successfully on its own merit. So Joyride—true to its name—embarked on a brazen commercial strategy of "joyriding" on the equity of America's favorite sour chewy candy brand.

4. Specifically, in a transparent effort to cause confusion and unlawfully profit from the goodwill of the SOUR PATCH KIDS brand, in 2025 Joyride launched a redesigned sour chewy candy product, which it renamed "Sour Smacks." The redesigned packaging features nearly identical copies of SOUR PATCH KIDS' kid-shaped mascot. And Joyride put its knock-off kids on knock-off yellow-and-green packaging intended to copy, and cause confusion with, SOUR PATCH KIDS' kid mascot and iconic yellow-and-green packaging.

**SOUR PATCH KIDS** | **Joyride**



5. The similarities that deliberately engender consumer confusion are undeniable: Both companies use cartoon-like depictions of a piece of candy roughly shaped like a kid, with "donut" eyes, smiles, and rounded limbs in similar postures, in virtually identical colors, with grainy textured skin and puffy body shapes. And both packages feature nearly the same specific bright yellow-and-green color scheme, accompanied by prominent illustrations of their respective kid mascots in similar colors.

6. Even the shape of Joyride's sour chewy candies themselves, which Joyride also redesigned and first launched in 2025 as "Sour Smacks," plainly intends to copy the iconic kid-shape configuration of the SOUR PATCH KIDS sour chewy candies that consumers have grown to love, confirming Joyride's continuous step-by-step encroachment upon Mondelēz's rights.

**The Taunts Get Louder**

7. Joyride's rebranding choices in 2025 were not accidental. Joyride intentionally made these changes only after selling ***two*** earlier versions unsuccessfully—neither of which used SOUR PATCH KIDS' famous kid mascot, SOUR PATCH KIDS' recognizable-at-a-glance packaging, or SOUR PATCH KIDS' iconic kid-shaped candy configuration.

**2020** **2022** **2025**



8. Joyride publicly confirmed as much. In January 2025, ***before*** its "Sour Smacks" rebrand, Joyride blasted social media with the consistent message that its goal was to usurp and surpass SOUR PATCH KIDS' popularity by any means necessary. This included a social media video labeled "Strategy to Surpass Sour Patch Kids on Instagram," in which Joyride's newly-minted Chief Creative Officer, YouTuber Ryan Trahan, upon discovering that "Sour Patch Kids is the most-followed candy brand on Instagram," crowed that "my goal is for my candy brand, Joyride, to pass Sour Patch Kids in Instagram followers." The video repeatedly featured images of the SOUR PATCH KIDS' kid mascot, and is branded with the #SourPatchKids hashtag. In other videos, Mr. Trahan admits that Joyride "copied Sour Patch Kids' meme format in an attempt to pass them in Instagram followers." Joyride's strategy to associate itself with SOUR PATCH KIDS was successful: according to Joyride, its posts "went viral," supposedly gained Joyride "over 300,000 followers," and induced other major retail brands to comment on Joyride's posts.

9. Joyride's marketing continues to target SOUR PATCH KIDS, repeatedly comparing itself favorably to SOUR PATCH KIDS by touting its candy as a "better-for-you" or "less sugar" replica of the brand and, by implication, denigrating SOUR PATCH KIDS and its composition in the process.

10. Joyride's infringement of Mondelēz's intellectual property rights is particularly pernicious given that Mondelēz's and Joyride's respective sour chewy candies are not only sold in the same stores (such as Target, Walmart, and 7-Eleven), but also often appear on the ***same shelf***, where they are often purchased (like many candies) as impulse items, grabbed based on quick recognition of the SOUR PATCH KIDS kid mascot and distinctive packaging. That is, Joyride depends on SOUR PATCH KIDS consumers' lack of close inspection to trick them into pulling Joyride's product off the shelf rather than the intended SOUR PATCH KIDS. It is no surprise,

then, that Joyride has accomplished its goal of causing actual confusion in the marketplace, where consumers are likely to conflate the two brands.

11. Joyride's copycat approach is not isolated to just this one product; copying its competitors is the ***distinctive feature*** of Joyride's business playbook across its entire product line. Joyride has built its business model upon a systematic practice of copying Mondelēz's (and other candy companies') packaging, rather than doing its own work to gain customers on its own merit.

**Joyride's Big Allowance**

12. Joyride is no start-up, grassroots campaign by a small market entrant, despite being disguised by Joyride to appear that way to its social media followers. Rather, this is a well-funded, private equity-backed corporation that adopted its strategy of copying as a core business value.

13. In May 2025, around the same time it launched its rebranded infringing "Sour Smacks" sour chewy candies, Joyride disclosed to the SEC that it raised a new $30 million funding round from private equity—an amount that would value the company at approximately $100 million. Joyride's ability to attract this kind of funding and command an eye-popping equity valuation is inextricably intertwined with—and, on information and belief, substantially bolstered by—its strategy of trading on SOUR PATCH KIDS' market-leading goodwill and recognizability.

14. The timing of Joyride's 2025 redesign confirms as much. Only after Joyride's original two designs didn't achieve the result it wanted, Joyride resorted to first chasing SOUR PATCH KIDS for social media eyeballs, and then to unlawfully copying the core elements of SOUR PATCH KIDS' brand identity. That was not just the ***result*** of Joyride's conduct, it was the ***goal***. And in taking these actions, Joyride crossed the line from competition to unfair competition.

**The Need To Enforce The Playground Rules**

15. This is not a complicated case. Joyride sells its competing sour chewy candies bearing a confusingly similar kid mascot, on confusingly similar packaging, in the same and

similar stores, to similar consumers, at a similar price point, engaging in similar marketing activity, all with the intention to capitalize on SOUR PATCH KIDS' goodwill. As a result, consumers are likely to be confused—and have been confused—into believing that Joyride's "Sour Smacks" comes from or is associated or affiliated with Mondelēz, usurping the reputation and goodwill that Mondelēz has developed in its SOUR PATCH KIDS brand.

16. Joyride is welcome on the playground—there's plenty of room for anyone who wants to play fairly. But fair play means following the well-established rules, and Joyride has shown no interest in playing fair. Instead, it built its business around looking as much like others as possible and trying to trick consumers into thinking they're someone else—like SOUR PATCH KIDS. What Joyride is doing is theft. It is intentional and deliberate. And it is unlawful.

17. Mondelēz is not in the business of suing; its business is to bring its consumers some of the country's most beloved snacks, including SOUR PATCH KIDS candies. While Mondelēz actively enforces its rights in its SOUR PATCH KIDS intellectual property, rarely has it needed to resort to litigation to protect those rights. But when, in an attempt to resolve this dispute, Mondelēz repeatedly asked Joyride to cease this infringement, Joyride refused to stop. Mondelēz thus was left with no choice but to protect its SOUR PATCH KIDS brand through litigation.

18. Mondelēz does not file this action lightly. But it is regrettably necessary to protect the longstanding goodwill in the SOUR PATCH KIDS kid mascot, packaging trade dress, and candy design, and to stop Joyride from confusing consumers and stealing intellectual property. Mondelēz thus seeks injunctive relief to stop Joyride's willful trademark infringement, trade dress infringement, unfair competition, and dilution under federal and state law, and monetary damages to compensate Mondelēz for the injuries it has suffered from Joyride's rampant misconduct.

## PARTIES

19. Plaintiff Mondelēz Global LLC ("Mondelēz Global") is a Delaware limited liability company with its principal place of business located at 905 West Fulton Market, Suite 200, Chicago, Illinois 60607. Mondelēz (through its various global operating entities) manufactures and sells a wide variety of packaged snacks, including candy, in mass market sellers, convenience stores, value stores, and grocery stores, among many other channels, around the world. Mondelēz Global is the operating entity that markets, distributes, and sells Mondelēz products in the United States, including the SOUR PATCH KIDS products asserted in this Complaint.

20. Plaintiff Mondelez Canada Inc. ("Mondelez Canada") is a Canadian corporation with its principal place of business located at 277 Gladstone Avenue, Toronto, Ontario Canada M6J 3L9. Mondelez Canada is the owner of the intellectual property rights in the SOUR PATCH KIDS brand, including its kid mascot, packaging, and product configuration rights asserted in this Complaint. Mondelez Canada licenses the intellectual property rights asserted in this Complaint to Mondelēz Global.

21. On information and belief, Defendant Project 7, Inc., d/b/a JOYRIDE, is a Delaware corporation with its principal place of business located at 7415 Southwest Parkway, Building 6, Suite 500-120, Austin, Texas 78735.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over the claims in this action under 28 U.S.C. §§ 1331, 1338(a) and (b), and 15 U.S.C. § 1121(a), including because this action involves claims of trademark infringement, trade dress infringement, unfair competition, and trademark dilution arising under the Lanham Act, 15 U.S.C. §§ 1114 and 1125. This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367(a), because the

state law claims arise from the same common nucleus of operative facts and transactions as the federal claims such that they form part of the same case or controversy.

23. This Court has personal jurisdiction over Joyride because, on information and belief, Joyride conducts business within Illinois and has committed trademark infringement, trade dress infringement, and dilution within Illinois. Joyride offers to sell, and sells, its infringing products throughout the United States and in Illinois, including in stores located in this District, such as Target, Walmart, and 7-Eleven stores located in Chicago. Joyride also markets and advertises its infringing products to consumers in Illinois, including in this District. Joyride also owns and operates an interactive website through which it markets, advertises, and sells its infringing products to Illinois consumers, including consumers in this District.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Joyride has infringed Mondelēz's trademark and trade dress rights in this District, and a substantial part of the events giving rise to the claims in this action occurred in this District, including Joyride's substantial sales of its infringing products in this District and its intentional marketing and advertising of its infringing products in this District.

**FACTS**

25. Mondelēz is a snack food market leader with brands sold in over 150 countries, including well-known brands such as OREO cookies and RITZ crackers.

26. Mondelēz manufactures and sells well-known brands of candy, confectionery, and chocolate, with multiple universally recognizable and iconic brands sold in the United States, including SWEDISH FISH, TOBLERONE, and HU. In certain instances, Mondelēz's brands have become so iconic that their reach extends beyond the snack aisle and into popular culture.

27. One of Mondelēz's most recognizable candy brands is SOUR PATCH KIDS, a tasty, sour, sugar-coated, soft, chewy candy. Consumers instantly recognize products sold under

the SOUR PATCH KIDS brand—a result of a first-class marketing campaign supported by extensive intellectual property. Mondelēz's highly distinctive trademarks, trade dresses, and product configuration have elevated SOUR PATCH KIDS to icon status—its marks and trade dress can be found on a wide variety of licensed products, from socks to school supplies.

**THE HISTORY OF SOUR PATCH KIDS**

28. SOUR PATCH KIDS candies were first sold in the 1970s in Canada under the name "Mars Men." In 1985, the candy was rebranded as "Sour Patch Kids" and introduced to the U.S. market. By no later than 1989, the current iconic shape of the candy had taken form (the "SPK Product Design"), as shown to the right.



29. Mondelēz and its predecessors have deliberately cultivated the brand's playful and distinctive reputation, bag-by-bag and box-by-box.

30. In 2012, Mondelēz acquired the SOUR PATCH KIDS brand, selling the sour chewy candy worldwide, including in the United States. That year, Mondelēz featured its "kid" mascot on packaging in the United States (the "SPK Kid Mark"). By 2013, the SPK Kid Mark appeared on SOUR PATCH KIDS packaging in red, orange, blue, green, and yellow:



31. By no later than 2013, Mondelēz began to market and sell SOUR PATCH KIDS sour chewy candies under the SOUR PATCH KIDS distinctive trade dress, consisting of: (a) a




background consisting of a yellow-and-green color scheme, in specific bold shades; (b) accompanied by prominent images of the SPK Kid Mark in bold colors (the "SPK Trade Dress"), as shown to the right.

32. Today, SOUR PATCH KIDS are the top-selling sour chewy candies in the United States. Since 2021 alone, Mondelēz has spent tens of millions of dollars every year advertising and promoting its SOUR PATCH KIDS products featuring the SPK Kid Mark, the SPK Trade Dress, and the SPK Product Design in the United States, and as discussed below, has enjoyed substantial sales and success.

**MONDELĒZ'S HIGHLY VALUABLE INTELLECTUAL PROPERTY**

33. With so much invested in building the brand over the years, Mondelēz's highly valuable intellectual property is protected in numerous ways.

34. Mondelez Canada owns the following federal registrations for the SPK Kid Mark and SPK Product Design (collectively, the "SPK Registered Marks"):

| Reg. No. | Mark | Description | Reg. Date | Goods/Services |
|---|---|---|---|---|
| 5,514,097 |  | Color is not claimed as a feature of the mark.<br><br>The mark consists of a cartoon-like depiction of a piece of candy roughly shaped like a man inside a square box. | July 10, 2018 | I.C. 030: Candy |
| 2,812,019 |  | Color is not claimed as a feature of the mark.<br><br>The mark consists of the configuration of a piece of candy roughly shaped like a man. | Feb. 10, 2004 | I.C. 030: Candy |

35. These registrations are incontestable under 15 U.S.C. § 1065, as the SPK Registered Marks have been in continuous use for more than five consecutive years subsequent to the date of registration, are still in use in commerce, and have been maintained with the required declarations submitted to the United States Patent and Trademark Office. These registrations constitute conclusive evidence: (a) of Mondelez Canada's ownership and title to the SPK Registered Marks; (b) of Mondelēz's exclusive right to use the SPK Registered Marks; and (c) that the SPK Registered Marks are valid and subsisting, including that they are distinctive and non-functional, and cannot be cancelled on grounds of non-distinctiveness or functionality. Copies of the registration certificates for the SPK Registered Marks are attached hereto as Exhibit A.

36. Further, as detailed below, in addition to its trademark rights derived from its incontestable federal registrations, Mondelēz owns valid, protectable common law rights in the SPK Kid Mark, SPK Trade Dress, and SPK Product Design (collectively, the "SPK Marks") because they are inherently distinctive and/or have acquired distinctiveness through consumers' longstanding recognition of these marks as the source of SOUR PATCH KIDS' products.[1]

37. Mondelēz vigorously enforces the SPK Marks against potential acts of infringement. As a result of these efforts, third parties have voluntarily ceased uses of marks, packaging, and/or designs that Mondelēz has alleged infringe its rights in one or more SPK Marks.

**THE SPK KID MARK**

38. Since its debut in 2012, the SPK Kid Mark has become a celebrity in its own right. Over time, this icon has been used as branding on SOUR PATCH KIDS-affiliated products, from lip balm, to breakfast cereal, to Halloween costumes, and more.

---

[1] As used in this Complaint, the term "SPK Kid Mark" includes both the registered and common law rights in the SPK Kid Mark, and the term "SPK Product Design" includes both the registered and common law rights in the SPK Product Design.

39. For example, SOUR PATCH KIDS are a social media phenomenon. As of October 2026, its TikTok page—which prominently features the SPK Kid Mark—has over 3.8 million followers. Similarly, its Facebook page has over 3.1 million followers, and its Instagram account has over 1 million followers. The SPK Kid Mark also has been featured in television commercials across the nation, which over the last five years alone have resulted in tens of thousands of independent airings, resulting in approximately over 5 billion collective impressions.

40. In 2017, 2018, and 2019, the SPK Kid Mark was featured on the SOUR PATCH KIDS float at the Macy's Thanksgiving Day Parade in New York City, collectively viewed by tens of millions of people throughout the United States.

**<u>SOUR PATCH KIDS 2017 Macy's Thanksgiving Day Parade Float</u>**



**<u>SOUR PATCH KIDS 2019 Macy's Thanksgiving Day Parade Float</u>**



41. Extensive merchandise featuring the SPK Kid Mark is a testament to the SPK Kid Mark's renown. This includes, for example, plushies, clothing, bed sheets, Christmas tree ornaments, lip balm, and Halloween costumes, and more:



















42. Mondelēz has entered collaborations and licenses with prominent brands showcasing the SPK Kid Mark—for example, Mondelēz entered a collaboration with Post for SOUR PATCH KIDS Cereal, featuring the SPK Kid Mark on the box (and the SPK Product Design as the shape of the cereal).




43. Other examples of collaborations include Snapple, Oreo, J&J Snack Foods, musicians such as Olivia Rodrigo (in connection with her album "Sour"), the Netflix hit "Stranger Things," Fruit Riot, Odd Sox, and more, all featuring the SPK Kid Mark:































44. Mondelēz has used, and continues to use, the SPK Kid Mark uniformly and consistently as a source identifier of SOUR PATCH KIDS sour chewy candies. Mondelēz's advertising and promotional efforts for the SPK Kid Mark include, among other things, internet advertising (including social media), television commercials, promotions, public relations, and point-of-sale materials, and it has received unsolicited media attention.

45. Since 2021 alone, Mondelēz has made nationwide yearly expenditures of tens of millions of dollars in sales and advertising featuring the SPK Kid Mark, and hundreds of millions of dollars in nationwide yearly product sales bearing the SPK Kid Mark.

46. As a result of Mondelēz's promotional efforts, advertising, sales, and enforcement, Mondelēz enjoys a highly valuable reputation and goodwill symbolized by the SPK Kid Mark. It is uniquely affiliated with the brand, recognized as denoting goods originating exclusively from Mondelēz. The SPK Kid Mark is inherently distinctive, and also has acquired distinctiveness, as it is commercially strong, evidenced by, for example: (a) its use as a source-identifier since at least 2012; (b) Mondelēz's nationwide advertising and sales of products bearing the mark; and (c) the mark's broad consumer reach and recognition. Mondelēz thus owns strong, valid and protectable common law rights in the SPK Kid Mark, in addition to those conferred by federal trademark Registration No. 5,514,097, which is presumed distinctive and non-functional.

47. Joyride acknowledges that the SPK Kid Mark is a strong source identifier for Mondelēz and the SOUR PATCH KIDS brand. For example, in January 2025—***before*** Joyride launched its rebranded infringing "Sour Smacks" candies—Joyride posted a TikTok video acknowledging that "Sour Patch Kids is the most-followed candy brand on Instagram," and the "goal is for my candy brand, Joyride, to pass Sour Patch Kids in Instagram followers"—the video repeatedly features the SPK Kid Mark as the identifier of SOUR PATCH KIDS:









48. Moreover, before Joyride commenced its infringing uses, the SPK Kid Mark was widely recognized by the general consuming public as a designation of Mondelēz. The SPK Kid Mark thus is strong, famous, and subject to a broad scope of protection.

**THE SPK TRADE DRESS**

49. By no later than 2013, Mondelēz began to market and sell SOUR PATCH KIDS brand candy in the United States in highly distinctive packaging, which consumers associate exclusively with Mondelēz. An example of the SPK Trade Dress is depicted below:




50. The SPK Trade Dress features the following combined elements: (a) a background consisting of a yellow-and-green color scheme, as exemplified above, in specific bold shades; (b) accompanied by prominent images of the SPK Kid Mark in bold colors. The SPK Trade Dress is recognized by consumers as a source identifier for SOUR PATCH KIDS sour chewy candies. For example, candystore.com—which refers to itself as the largest online candy store—describes the SPK Trade Dress as "eye-catching peg bags [that] feature vibrant yellow and green graphics that showcase the beloved kid-shaped candies."

51. Mondelēz uses the SPK Trade Dress consistently across many SOUR PATCH KIDS products. While the products come in a variety of forms and sizes, the use of these distinctive packaging elements renders them collectively identifiable as SOUR PATCH KIDS products:




52. Mondelēz also has entered licenses for products showcasing the SPK Trade Dress (in addition to the examples above):



53. Mondelēz has used, and continues to use, the SPK Trade Dress uniformly and consistently as a source identifier of SOUR PATCH KIDS sour chewy candies, as well as in connection with licensed products. Mondelēz has sold over 350 million units of SOUR PATCH KIDS Original sour chewy candies in the United States under the SPK Trade Dress. Products featuring or sold under the SPK Trade Dress are available in more than 200,000 stores in the United States, including mass-market sellers (such as Target and Walmart), convenience stores and pharmacies (such as CVS and Walgreens), candy stores, grocery chains (such as Publix), value stores (such as Dollar General), and mom-and-pop stores, as well as online.

54. In the past five years alone, Mondelēz has spent tens of millions of dollars advertising and promoting SOUR PATCH KIDS products under the SPK Trade Dress nationwide. Mondelēz's promotional efforts include, among other things, internet advertising (including social media), television commercials, promotions, public relations, and point-of-sale materials, and the SPK Trade Dress has received unsolicited media attention.

55. As a result of Mondelēz's promotional efforts, advertising, sales, and enforcement, Mondelēz enjoys a highly valuable reputation and goodwill symbolized by the SPK Trade Dress. It is uniquely affiliated with the SOUR PATCH KIDS brand, recognized as denoting goods originating exclusively from Mondelēz. The SPK Trade Dress is both inherently distinctive, and has acquired distinctiveness, as it is commercially strong, evidenced by, for example: (a) its use as a source-identifier since at least 2013; (b) Mondelēz's nationwide advertising and sales of products bearing the SPK Trade Dress; and (c) the SPK Trade Dress' broad consumer reach and recognition. Mondelēz thus owns strong, valid, and protectable common law rights in the SPK Trade Dress.

56. The SPK Trade Dress is unique, distinctive, arbitrary, and non-functional, meaning that it is not essential to its purpose and does not affect its cost or quality. The combination of

elements that make up the SPK Trade Dress is not functional for the purposes of 15 U.S.C. § 1125(a)(3), as: (a) the elements making up the SPK Trade Dress are not essential to the use or purpose of the underlying products or packaging; (b) it does not affect the cost or quality of the product or packaging; and (c) when used exclusively by Mondelēz, it does not put any third parties at a significant non-reputation-related disadvantage.

57. Nor is it competitively necessary to use the SPK Trade Dress in the sour chewy candy market. Legions of third parties sell competing sour chewy candy products with a non-infringing trade dress, *i.e.*, packaging that does not use ***both*** the trade dress elements identified above together. As noted below, for many years before 2025, Joyride itself used multiple different trade dresses for its sour chewy candies that did not use both elements together.

**THE SPK PRODUCT DESIGN**

58. Since at least as early as 1989, Mondelēz (or its predecessors) marketed and sold SOUR PATCH KIDS sour chewy candies in a configuration roughly shaped like a human, consisting of the SPK Product Design.



59. The SPK Product Design is protected by incontestable federal trademark Registration No. 2,812,019, and thus is presumed distinctive and non-functional.

60. In addition, Mondelēz has acquired common law rights in the SPK Product Design, based on the more than thirty years of continuous use of the SPK Product Design's configuration, which has become associated exclusively with Mondelēz as its source, including based on the nationwide reach, promotion, and sales of SOUR PATCH KIDS sour chewy candies, as discussed above. For example, Mondelēz has sold over 350 million units of SOUR PATCH KIDS Original sour chewy candies, which embody the SPK Product Design, in all 50 states.

61. Mondelēz has used, and continues to use, the SPK Product Design uniformly and consistently as a source identifier of SOUR PATCH KIDS sour chewy candies. As a result, the SPK Product Design is widely recognized—for example, the SPK Product Design's unique configuration has been touted by *Parade* magazine, which announced that "nothing can beat the OG shape of Sour Patch Kids" and its "iconic kids' shape."

62. As a result of Mondelēz's promotional efforts, advertising, sales, and enforcement, Mondelēz enjoys a highly valuable reputation and goodwill that is symbolized by the SPK Product Design, whereby it has become recognized as denoting goods originating exclusively from Mondelēz. Mondelēz thus owns strong, valid and protectable common law rights in the SPK Product Design.

63. The SPK Product Design is unique, distinctive, arbitrary, and non-functional, meaning that it is not essential to its purpose and does not affect its cost or quality. The configuration of the SPK Product Design is not functional for the purposes of 15 U.S.C. § 1125(a)(3), as: (a) the configuration of the SPK Product Design is not essential to the use or purpose of the underlying products or packaging; (b) the configuration does not affect the cost or quality of the product or packaging; and (c) when used exclusively by Mondelēz, the configuration does not put any third parties at a significant non-reputation-related disadvantage.

64. Nor is it competitively necessary to use the SPK Product Design in the sour chewy candy market. Legions of third parties sell competing sour chewy candy products with a non-infringing product configuration. As noted below, for many years before 2025, Joyride itself used a completely different product configuration that did not infringe the SPK Product Design.

65. The distinctive configuration of the SPK Product Design identifies and distinguishes SOUR PATCH KIDS brand candies from others' candies in the market.

## JOYRIDE'S INFRINGEMENT AND DILUTION OF MONDELĒZ'S TRADEMARK RIGHTS

66. Joyride—which sells (among other things) sour chewy candies—has unlawfully benefited from trading on the time, effort, and resources that Mondelēz poured, and continues to pour, into the SOUR PATCH KIDS brand, which has led the brand to achieving its icon status. With SOUR PATCH KIDS in its sights, Joyride applied its systematic approach of copying its competitors' candies and packaging to Mondelēz, with the intent to confuse consumers and to associate its brand with the iconic SPK Kid Mark.

67. On information and belief, Project 7, Inc. was founded in or around 2008 as a philanthropy-linked chewing gum, mint, and candy company.

68. On information and belief, in or around 2020, Project 7 launched a line of sour chewy candies called "Sour Fruit Gummies." The packaging consisted of purple fields at the top and bottom, with a large smiling piece of fruit in the center on a white background, featuring different color slices indicating different fruit flavors. In addition, the front of the package featured a realistic depiction of the actual "Sour Fruit Gummies" candy: an orange bear. As shown below, the packaging and product for "Sour Fruit Gummies" looked nothing like the SPK Marks:

| <u>2020 Project 7 "Sour Fruit Gummies"</u> | <u>SOUR PATCH KIDS</u> |
|---|---|
|  |  |





69. On information and belief, in or around 2022, Project 7, Inc. rebranded as "Joyride." As part of that rebrand, Joyride revised the packaging for its "Sour Fruit Gummies" candy, redesigning it so that it had predominantly yellow-and-green thick curved squiggles, and multiple realistic images of its actual red and orange bear-shaped sour chewy candies. As Joyride's contemporaneous announcement proclaimed: "New name, same GREAT candy!":







70. On information and belief, in or around February 2024, Joyride hired YouTuber Ryan Trahan as the company's "Co-Owner and Chief Creative Officer," so that it could leverage Mr. Trahan's then-following of 14.6 million YouTube subscribers.

71. On information and belief, in or around April 2025—near the time Joyride reported to the SEC that it had secured $30 million in equity funding, which would value the company at about $100 million—Joyride ***again*** launched a re-redesigned version of its "Sour Fruit Gummies," this time with a new kid mascot, new packaging, a new candy configuration, and the new name "Sour Smacks," as shown to the right.




72. Joyride's re-redesigned "Sour Smacks" sour chewy candies' kid mascot, packaging, and product configuration blatantly copy the SPK Kid Mark, SPK Trade Dress, and SPK Product Design in multiple ways.

73. **<u>Infringing Kid Mark</u>**: Joyride infringes the SPK Kid Mark by presenting its own illustrated "kid" mark (the "Infringing Kid Mark") that is confusingly similar—indeed, nearly identical to—the SPK Kid Mark. Both mascots feature cartoon-like depictions of a piece of candy roughly shaped like a person, with "donut" eyes, smiles, and rounded limbs in similar postures, in virtually identical colors, with grainy textured skin and puffy body shapes.

**<u>SPK Kid Mark</u>**



**<u>Infringing Kid Mark</u>**



74. In addition, Joyride's adoption of the Infringing Kid Mark creates an association with the famous SPK Kid Mark, impairing the SPK Kid Mark's distinctiveness.

75. **Infringing Trade Dress**: Joyride's new packaging for its "Sour Smacks" candies infringes the distinctive elements of the SPK Trade Dress by using packaging elements that are collectively confusingly similar to Mondelēz's packaging, including: (a) a predominantly yellow-and-green color scheme that is highly similar to the specific yellow-and-green color scheme of the SPK Trade Dress; along with (b) illustrated renditions of candies (rather than reproductions of the candies themselves, as Joyride previously used) that are highly similar to the appearance of the SPK Kid Mark on the SPK Trade Dress (the "Infringing Trade Dress").

**SPK Trade Dress**




**Infringing Trade Dress**




76. On information and belief, Joyride uses the Infringing Trade Dress, and the Infringing Kid Mark, in connection with the same kinds of goods—sour chewy candies—at similar price points, offered to the same class of consumers, through the same marketing channels, to many of the same retailers such as Target and Walmart. Indeed, Mondelēz's SOUR PATCH KIDS and Joyride's "Sour Smacks" product can appear on the ***same shelf*** in the marketplace.

**<u>SOUR PATCH KIDS and Joyride's "Sour Smacks" in a Target store</u>**




77. Joyride's Infringing Trade Dress, and the Infringing Kid Mark, are likely to cause confusion—particularly initial-interest confusion—given that the parties' respective products tend to be impulse items, purchased with little advanced planning and upon a fast glance. For example, even if consumers later realize that the candy they grabbed is not authentic SOUR PATCH KIDS sour chewy candies before they finalize a purchase, some portion of those shoppers are likely to not bother to go back and make the switch. Such initial-interest confusion is unlawful.

78. In addition, on information and belief, Mondelēz and Joyride both offer their respective products online through Amazon and Instacart, as well as their respective websites, and both market their products through viral online campaigns and social media.

79. Joyride's use of the Infringing Trade Dress, and the Infringing Kid Mark, has caused, and is likely to further cause, actual confusion in the marketplace. Some Joyride customers simply identify Joyride's product as "sour patch kids." One online commenter on a review of Joyride's product, for example, described "Sour Smacks" as "rebranded sour patch kids."

80. Joyride's uses of the Infringing Trade Dress, and the Infringing Kid Mark, thus are likely to cause initial interest, point-of-sale, and post-sale confusion with the SPK Trade Dress and SPK Kid Mark.

81. **Infringing Product Design**: Joyride's candy configuration for its rebranded "Sour Smacks" infringes Mondelēz's SPK Product Design. In connection with its launch of the Infringing Kid Mark and Infringing Trade Dress, Joyride also redesigned its sour chewy candy into a product configuration (the "Infringing Product Design") that is confusingly similar—indeed, nearly identical—to the SPK Product Design. For example, as shown on the right, both are configured roughly in the similar shape of a person, in similar colors—even though the name "Sour Smacks" has nothing to do with the shape of a kid.

| **SPK Product Design** | **Infringing Product Design** |
| --- | --- |
|  |  |

82. The Infringing Product Design, especially when encountered with the Infringing Kid Mark and Infringing Trade Dress, is likely to cause confusion among consumers. As noted above, Joyride uses the Infringing Kid Mark and Infringing Trade Dress in connection with highly similar goods, offered to the same class of consumers, through the same marketing channels, to many of the same retailers. Consumers who encounter the Infringing Product Design as part of the same marketplace experience—for example, after opening a "Sour Smacks" bag under the misimpression they had purchased SOUR PATCH KIDS—are likely to mistakenly believe the Infringing Product Design is an authentic SOUR PATCH KIDS sour chewy candy (or, even worse, mistakenly believe it is a flawed version of an authentic SOUR PATCH KIDS sour chewy candy).

83. The Infringing Product Design is also likely to cause confusion among consumers in a post-sale context, where the product may be separated from its packaging or the packaging

may otherwise be discarded or disregarded, given that both parties offer similarly shaped and colored sour chewy candies that are likely to be viewed in the context of a fast glance.

## JOYRIDE'S INFRINGEMENT OF MONDELĒZ'S TRADEMARK RIGHTS IS DELIBERATE, KNOWING, AND WILLFUL

84. Joyride's infringement of the SPK Marks is not a circumstance of accident or inadvertence; to the contrary, its copying of Mondelēz's (and other competitors') intellectual property is the centerpiece of the company's entire marketing strategy.

85. From 2020, to 2022, to 2025, every time Joyride redesigned its packaging and candy, it moved incrementally closer to copying the SOUR PATCH KIDS brand. Joyride started out with a completely different sour chewy candy package and product. But after it hired a viral YouTuber as its Co-Owner and Chief Creative Officer in 2024, and around the same time it reported to the SEC that it had received $30 million in private equity funding, Joyride fundamentally redesigned its packaging and product, for the second time in five years, to intentionally mirror the SPK Marks, as reflected in its 2025 launch of "Sour Smacks":




86. This was accompanied by a marketing campaign that specifically targeted SOUR PATCH KIDS, demonstrating Joyride's intent to benefit unlawfully and unfairly from the

reputation and prestige associated with the SPK Marks, and to trade on the goodwill Mondelēz has developed in them.

87. Joyride launched its SOUR PATCH KIDS-focused marketing campaign immediately before it commenced using the Infringing Kid Mark, Infringing Trade Dress, and Infringing Product Design (collectively, the "Infringing Marks")—a campaign that centered on comparing itself to SOUR PATCH KIDS and urging customers to help it virally usurp Mondelēz's position as the market leader. Joyride's social media campaign makes clear that the key to Joyride's strategy is copying SOUR PATCH KIDS—and making sure people think of them together.

88. As early as January 2025, Joyride created and published videos acknowledging that "Sour Patch Kids is the most-followed candy brand on Instagram," but then touted publicly that the "goal is for my candy brand, Joyride, to pass Sour Patch Kids in Instagram followers," urging customers to help Joyride "pass Sour Patch Kids." These videos admitted that Joyride "copied Sour Patch Kids' meme format in an attempt to pass them in Instagram followers" and boasted about the success of Joyride's copying going "viral," and gaining Joyride "over 300,000 followers." These videos are replete with references to SOUR PATCH KIDS, liberal use of images of SOUR PATCH KIDS social media accounts and hashtags, and prominently feature the SPK Kid Mark as the identity of the SOUR PATCH KIDS brand. The fact that Joyride created and posted such videos ***before*** it officially launched "Sour Smacks" months later (along with Joyride's use of the Infringing Marks) confirms that Joyride was fully aware of the power of these marks and their strong association with SOUR PATCH KIDS, and that Joyride intended to freeride on that brand recognition to sell its own confusingly similar product.

89. On information and belief, Joyride was instantly aware of confusion that its use of the Infringing Marks caused in the marketplace. For example, Joyride followed—and commented

on—social media accounts that included customers' comments indicating confusion (such as identifying "Sour Smacks" as "rebranded sour patch kids"). Joyride did nothing to dispel such confusion.

90. Joyride's broader marketing campaign also reflects an intent to trade off the SOUR PATCH KIDS brand in other contexts—for example, it compares "Sour Smacks" against SOUR PATCH KIDS by touting itself as a "better-for-you" or "less sugar" replica of the popular brand and, by implication, denigrating SOUR PATCH KIDS as a lower quality or less favorable product.

91. Joyride's copying of the SPK Marks is not an outlier. To the contrary, Joyride's mirroring of prominent elements of other Mondelēz candy packaging evinces a broad pattern and practice of copying. And Joyride has adopted this same strategy in copying features of ***other*** brands' packaging too—for example, the similarities in packaging between Nerds' Gummy Clusters and Joyride's "Gummy Busters," shown to the right, are uncanny.




92. Joyride's corporate strategy is copying—plain and simple. It is intentional. It is unethical. It is illegal. And it is designed to earn outsized and undeserved profits for its private equity backers, by stealing from the goodwill, hard-earned brand recognition, and innovation of its lawful competitors.

93. Not only is Joyride's infringement willful and wanton, it is continuing to this day. Mondelēz repeatedly notified Joyride that its infringing uses violate Mondelēz's intellectual property rights; Joyride refused to cease its infringing uses.

94. Joyride's unauthorized acts as described herein are inconsistent with Mondelēz's federal trademark registrations and common law rights in the SPK Marks. Joyride's infringement of the SPK Marks is an intentional, willful, and bad faith attempt to trade on the goodwill that Mondelēz has developed in those marks. Joyride's infringement has caused and will continue to cause financial injury to Mondelēz, and has caused and will continue to cause irreparable injury to Mondelēz's business and goodwill unless permanently enjoined by this Court.

95. Mondelēz has no adequate remedy at law. Mondelēz brings this lawsuit to stop and rectify this patently unlawful behavior.

**COUNT I**
**FEDERAL TRADEMARK INFRINGEMENT:**
**SPK KID MARK AND SPK PRODUCT DESIGN**
**(15 U.S.C. § 1114)**

96. Mondelēz repeats and realleges each allegation in paragraphs 1 through 95 as if fully set forth herein.

97. Mondelēz has prior rights over Joyride in and to the SPK Registered Marks by virtue of Mondelēz's use of the SPK Registered Marks in interstate commerce before Joyride commenced its use, and as evidenced by Mondelez Canada's ownership of the federal trademark registrations in Exhibit A.

98. The SPK Registered Marks are valid, subsisting, and used in commerce. The SPK Kid Mark is inherently distinctive. In addition, the SPK Registered Marks have acquired secondary meaning in the marketplace through their extensive and long-standing, exclusive use in commerce. The SPK Registered Marks are strong, distinctive and non-functional, and are incontestable.

99. The Infringing Kid Mark and Infringing Product Design used by Joyride are confusingly similar to the SPK Registered Marks. For example, as to the SPK Kid Mark, its federal trademark registration states: "The mark consists of a cartoon-like depiction of a piece of candy

roughly shaped like a man inside a square box." The Infringing Kid Mark likewise consists of a cartoon-like depiction of a piece of candy roughly shaped like a man. As to the SPK Product Design, its federal trademark registration states: "The mark consists of the configuration of a piece of candy roughly shaped like a man." The Infringing Product Design likewise consists of the configuration of a piece of candy roughly shaped like a man.

100. Joyride's use of the Infringing Kid Mark and Infringing Product Design on or in connection with its advertising, distribution, and sale of its sour chewy candies is likely to confuse and deceive consumers and the public as to the source or sponsorship of Joyride's products, and/or is likely to mislead consumers into believing that Joyride's products are manufactured, licensed, sponsored or otherwise approved by Mondelēz. Such implications are false, confusing to consumers, and material to consumers' purchasing decisions. As detailed above, the SPK Registered Marks are commercially strong, and the SPK Kid Mark is inherently strong. In addition, the Infringing Kid Mark and Infringing Product Design are highly similar to the SPK Registered Marks when considered in their marketplace contexts; are used on nearly identical goods (sour chewy candy); are targeted to and sold to the same customer base in the same or similar retail environments (often in the same stores, sometimes on the same shelf) at similar price points, where consumers are likely to exercise a low degree of care; are advertised through the same or similar marketing channels; Joyride intended to palm off its product as that of Mondelēz; and Joyride's use of the Infringing Marks has caused actual confusion.

101. For these reasons, Joyride's use of the Infringing Kid Mark and Infringing Product Design is likely to cause initial-interest confusion, point-of-sale confusion, and post-sale confusion.

102. Joyride's use of the Infringing Kid Mark and Infringing Product Design constitutes infringement of the SPK Registered Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

103. Joyride's continued use of the Infringing Marks is willful, requires deterrence, and/or unjustly enriches Joyride, entitling Mondelēz to its actual damages, an accounting and disgorgement of Joyride's profits, and treble damages.

104. Joyride's use of the confusingly similar Infringing Kid Mark and Infringing Product Design has caused and is likely to further cause irreparable injury to Mondelēz's name and reputation, as well as to the goodwill in the SPK Registered Marks carefully cultivated by Mondelēz. The extent of this harm cannot be fully quantified, constitutes irreparable injury, and leaves Mondelēz with no adequate remedy at law.

## COUNT II
## FALSE DESIGNATION OF ORIGIN, PASSING OFF, AND UNFAIR COMPETITION: SPK KID MARK, SPK TRADE DRESS, AND SPK PRODUCT DESIGN (15 U.S.C. § 1125(a))

105. Mondelēz repeats and realleges each allegation in paragraphs 1 through 104 as if fully set forth herein.

106. The SPK Marks are valid, subsisting, and used in commerce. The SPK Marks are protected as common law trademarks, on the basis that each is inherently distinctive, and additionally by virtue of Mondelēz's extensive and long-standing, exclusive use of each SPK Mark in commerce, such that the SPK Marks have acquired secondary meaning. The SPK Marks are strong, distinctive, and non-functional. Mondelēz has senior rights over Joyride in connection with the SPK Marks.

107. Mondelēz has prior rights over Joyride in and to the SPK Marks by virtue of its use of the SPK Marks in interstate commerce, and its acquisition of common law rights in the SPK Marks, before Joyride commenced its use of the Infringing Marks.

108. Joyride's use of each of the Infringing Marks on or in connection with the advertising, distribution, and sale of its sour chewy candies is likely to confuse and deceive consumers and the public as to the source or sponsorship of Joyride's products, and/or is likely to mislead consumers into believing that Joyride's products are manufactured, licensed, sponsored or otherwise approved by Mondelēz. Such implications are false, confusing to consumers, and material to consumers' purchasing decisions. As detailed above, the SPK Marks are commercially strong, and the SPK Kid Mark and SPK Trade Dress are inherently strong. In addition, the Infringing Marks are highly similar to the SPK Marks when considered in their marketplace contexts; are used on nearly identical goods (sour chewy candy); are targeted to and sold to the same customer base in the same or similar retail environments (often in the same stores, sometimes on the same shelf) at similar price points, where consumers are likely to exercise a low degree of care; are advertised through the same or similar marketing channels; Joyride intended to palm off its product as that of Mondelēz; and Joyride's use of the Infringing Marks has caused actual confusion.

109. For these reasons, Joyride's use of the Infringing Marks is likely to cause initial-interest confusion, point-of-sale confusion, and post-sale confusion.

110. Independently, Joyride has unfairly competed with Mondelēz through its collective action of using the Infringing Marks together on or in connection with the advertising, distribution, and sale of its sour chewy candies, which, for the reasons set forth above, is likely to confuse and deceive consumers and the public as to the source or sponsorship of Joyride's products, and fails

to adequately distinguish its goods from those of Mondelēz, thereby passing off its goods as those of Mondelēz.

111. Joyride's unauthorized use of the Infringing Marks in connection with the promotion and sale of Joyride's goods and services falsely suggests that these goods and services are connected with, sponsored by, affiliated with, or related to Mondelēz.

112. Joyride's unauthorized use of the Infringing Marks constitutes false designation of origin and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

113. Joyride's continued use of the Infringing Marks is willful, requires deterrence, and/or unjustly enriches Joyride, entitling Mondelēz to its actual damages, an accounting and disgorgement of Joyride's profits, and treble damages.

114. Joyride's conduct has damaged Mondelēz and, unless enjoined by the Court, will further impair the value of the SPK Marks and the goodwill associated with them. The extent of this harm cannot be fully quantified, constitutes irreparable injury, and leaves Mondelēz with no adequate remedy at law.

**COUNT III**
**FEDERAL DILUTION BY BLURRING:**
**SPK KID MARK**
**(15 U.S.C. § 1125(c))**

115. Mondelēz repeats and realleges each allegation in paragraphs 1 through 114 as if fully set forth herein.

116. Mondelēz has prior rights over Joyride in and to the SPK Kid Mark, including by virtue of Mondelēz's use of the SPK Kid Mark in interstate commerce before Joyride commenced its use, and as evidenced by Mondelez Canada's ownership of the federal trademark registration for the SPK Kid Mark in Exhibit A.

117. The SPK Kid Mark is valid, subsisting, and used in commerce. The SPK Kid Mark is inherently distinctive, and it also has acquired secondary meaning in the marketplace through its extensive and long-standing, exclusive use in commerce. The SPK Kid Mark is strong, distinctive and non-functional, and its trademark registration is incontestable.

118. The SPK Kid Mark is widely recognized by the general consuming public of the United States as a designation of Mondelēz's goods and services, and thus is famous as that term is used in 15 U.S.C. § 1125(c)(2)(A), based on, among other things: the duration, extent, and geographic reach of advertising and publicity featuring the SPK Kid Mark; the amount, volume, and geographic extent of sales featuring the SPK Kid Mark; the extent of actual recognition of the SPK Kid Mark; and the incontestable federal registration for the SPK Kid Mark.

119. Joyride commenced its use of its Infringing Kid Mark in commerce for commercial purposes, as described above, after the SPK Kid Mark became famous.

120. Joyride's use of the Infringing Kid Mark is likely to cause dilution by blurring of the SPK Kid Mark in violation of 15 U.S.C. § 1125(c)(1), such that Joyride's adoption and use of the Infringing Kid Mark is likely to create an association with the SPK Kid Mark that impairs its distinctiveness, based on, among other things: the high degree of similarity between the Infringing Kid Mark and the SPK Kid Mark; the high degree of distinctiveness of the SPK Kid Mark; Mondelēz's substantially exclusive use of the SPK Kid Mark; the high degree of consumer recognition of the SPK Kid Mark; Joyride's intent to create an association with the SPK Kid Mark; and actual association between the Infringing Kid Mark and the SPK Kid Mark. As a result, the exclusive association between the SPK Kid Mark and Mondelēz is likely to be irreparably harmed and diluted.

121. As a direct and proximate result of Joyride's actions alleged above, Mondelēz has been damaged and will continue to be damaged, unless enjoined by the Court.

122. Joyride's diluting use of the Infringing Kid Mark has caused and is likely to further cause irreparable injury to Mondelēz and to the distinctiveness of the SPK Kid Mark. The extent of this harm cannot be fully quantified, constitutes irreparable injury, and leaves Mondelēz with no adequate remedy at law.

123. In adopting and using the Infringing Kid Mark, Joyride willfully intended to trade on the widespread consumer recognition of the SPK Kid Mark, entitling Mondelēz to its actual damages, an accounting and disgorgement of Joyride's profits, and treble damages.

## COUNT IV
## COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION: SPK KID MARK, SPK TRADE DRESS, AND SPK PRODUCT DESIGN

124. Mondelēz repeats and realleges each allegation in paragraphs 1 through 123 as if fully set forth herein.

125. As set forth above, the SPK Marks are valid, subsisting and used in commerce, and Mondelēz has a protectable ownership interest in the SPK Marks.

126. As set forth above, Joyride's use of the Infringing Marks, including in Illinois and in this District, is likely to cause consumer confusion, infringing on Mondelēz's rights to the SPK Marks.

127. As set forth above, Joyride's continued use of the Infringing Marks is willful and in bad faith.

128. Mondelēz is entitled to damages, including punitive damages and nominal damages, for Joyride's violation of Mondelēz's common law rights in the SPK Marks.

129. Joyride's conduct has damaged Mondelēz and, unless enjoined by the Court, will further impair the value of the SPK Marks and the goodwill associated with them. The extent of

this harm cannot be fully quantified, constitutes irreparable injury, and leaves Mondelēz with no adequate remedy at law.

**COUNT V**
**ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT: SPK KID MARK, SPK TRADE DRESS, AND SPK PRODUCT DESIGN**
**(815 ILCS 505/1 *et seq.*)**

130. Mondelēz repeats and realleges each allegation in paragraphs 1 through 129 as if fully set forth herein.

131. As set forth above, the SPK Marks are valid, subsisting and used in commerce, and Mondelēz has a protectable ownership interest in the SPK Marks.

132. As set forth above, Joyride's use of the Infringing Marks, including in Illinois and in this District, is likely to cause consumer confusion, infringing on Mondelēz's rights to the SPK Marks.

133. Joyride, by its marketing and sale of the products bearing or consisting of the Infringing Marks, seeks to ride the coattails of the substantial reputation of the SPK Marks to benefit from their power of attraction, fame and/or prestige, and to exploit the marketing efforts expended by Mondelēz, thereby deceiving and misleading consumers.

134. Independently, Joyride has unfairly competed with Mondelēz through its collective action of using the Infringing Marks together on or in connection with advertising, distribution, and sale of its sour chewy candies, which, for the reasons set forth above, is likely to confuse and deceive consumers and the public as to the source or sponsorship of Joyride's products, and fails to adequately distinguish its goods from those of Mondelēz, thereby passing off its goods as those of Mondelēz.

135. Joyride intended that consumers would rely on its deceptive practices.

136. Joyride's use of the Infringing Marks as described above, including through advertising, promotion, and sales directed to and made in Illinois, constitutes unfair competition in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505 *et seq.*, as they are likely to deceive and mislead the public.

137. In addition to Mondelēz's actual damages, Joyride's conduct is egregious, intentional, and malicious, thus entitling Mondelēz to an award of punitive damages under 815 ILCS 505/10a(a). In addition, Mondelēz is entitled to its reasonable attorneys' fees and costs under 815 ILCS 505/10a(c).

138. Joyride's conduct has damaged Mondelēz and, unless enjoined by the Court, will further impair the value of the SPK Marks and the goodwill associated with them. The extent of this harm cannot be fully quantified, constitutes irreparable injury, and leaves Mondelēz with no adequate remedy at law.

**COUNT VI**
**ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT:**
**SPK KID MARK, SPK TRADE DRESS, AND SPK PRODUCT DESIGN**
**(815 ILCS 510/1 *et seq.*)**

139. Mondelēz repeats and realleges each allegation in paragraphs 1 through 138 as if fully set forth herein.

140. Joyride has engaged in a deceptive trade practice in the course of its business, including by: (a) passing off its goods or services as those of Mondelēz through the use of the Infringing Marks; (b) causing a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of its goods or services through its use of the Infringing Marks; (c) through its use of the Infringing Marks, causing a likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another;

and/or (d) engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding.

141. In adopting and using the Infringing Marks, Joyride willfully and in bad faith engaged in a deceptive trade practice. Joyride intended that consumers would rely on its deceptive trade practice.

142. Joyride's conduct has damaged Mondelēz and, unless enjoined by the Court, will further impair the value of the SPK Marks and the goodwill associated with them. The extent of this harm cannot be fully quantified, constitutes irreparable injury, and leaves Mondelēz with no adequate remedy at law.

143. As a result of Joyride's willful engagement in a deceptive trade practice, Mondelēz is entitled to its costs and attorneys' fees pursuant to 815 ILCS 510/3.

## COUNT VII
## ILLINOIS COMMON LAW UNJUST ENRICHMENT

144. Mondelēz repeats and realleges each allegation in paragraphs 1 through 143 as if fully set forth herein.

145. Mondelēz owns valuable rights in the SPK Marks, developed through substantial investment of time, effort, and resources, and has built significant goodwill and consumer recognition associated with the SPK Marks.

146. Joyride has used, and continues to use, the Infringing Marks in connection with the marketing, promotion, offer for sale, and/or sale of its competing sour chewy candies, Sour Smacks, without Mondelēz's authorization, consent, or license.

147. As a direct and proximate result of Joyride's unauthorized use of the Infringing Marks, Joyride has unjustly received, and continues to receive, a benefit—including but not limited to increased sales, consumer recognition, revenue, and profits—that rightfully belongs to

Mondelēz and that Joyride would not have obtained absent its unauthorized trading on the goodwill and reputation Mondelēz developed in the SPK Marks.

148. Joyride has knowingly and voluntarily accepted and retained this benefit, with full knowledge that the benefit was conferred through its unauthorized and infringing use of Mondelēz's SPK Marks.

149. Joyride's retention of this benefit is to Mondelēz's detriment, including but not limited to loss of sales, dilution of the distinctiveness of the SPK Marks, erosion of consumer goodwill, and loss of control over the reputation associated with the SPK Marks.

150. Joyride's retention of the benefits conferred upon it through its unauthorized use of the Infringing Marks violates the fundamental principles of justice, equity, and good conscience, and it would be inequitable for Joyride to retain such benefits without compensating Mondelēz for their value.

151. As a direct and proximate result of Joyride's conduct, Mondelēz has suffered damages in an amount to be determined at trial, and Mondelēz is entitled to restitution and disgorgement of Joyride's ill-gotten gains, in an amount to be proven at trial.

## REQUEST FOR RELIEF

WHEREFORE, Mondelēz respectfully requests relief as follows:

A. That Judgment be entered for Mondelēz on each of its claims.

B. An Order declaring that Joyride's use of the Infringing Marks infringes the SPK Marks, is likely to dilute the SPK Kid Mark, and constitutes deceptive business and trade practices, unfair competition, and unjust enrichment under federal and/or state law, as detailed above.

C. Permanent injunctive relief, enjoining and prohibiting Joyride, and its agents, servants, employees, officers, attorneys, successors and assigns, and all others in active concert or participation with Joyride, from:

i. Using the SPK Marks, or any version thereof, in connection with any product packaging or product configuration, that infringes, is confusingly similar to, or competes unfairly with the SPK Marks, in connection with the advertising, promoting, distributing, offering to sell, selling, or displaying any product, or in connection with the packaging of or configuration of any product;

ii. Promoting, advertising, selling, or otherwise using the Infringing Marks, or other version thereof, in violation of Mondelēz's rights in the SPK Marks;

iii. Applying to register, filing, maintaining, or retaining any registration or application to register in the United States Patent and Trademark Office or the trademark office of any State any of the Infringing Marks, or any version thereof, in connection with any product;

iv. Representing or suggesting, by any means, that any products or services manufactured, distributed, advertised, offered, or sold by Joyride are Mondelēz's products or services or vice versa, and from otherwise acting in a way likely to cause confusion, mistake, or deception on the part of purchasers or consumers as to the origin or sponsorship of such goods or services; and

v. Assisting, aiding, or abetting any other person or entity in engaging in or performing any of the activities referred to in subparagraphs (i)–(iv) above.

D. Directing that Joyride deliver to Mondelēz for destruction or other disposition, without any compensation to Joyride, all goods, labels, tags, signs, stationery, prints, packages, promotional and marketing materials, advertisements and other materials currently in its possession or under its control incorporating, featuring or bearing any Infringing Marks.

E. An Order declaring that Joyride's use of each of the Infringing Marks is willful, intentional, and in bad faith.

F. An award of all available monetary remedies, including but not limited to:

i. Pursuant to 15 U.S.C. § 1117(a), an award to Mondelēz of its actual damages, an equitable accounting of Joyride's profits, and the disgorgement of Joyride's profits to Mondelēz, and treble damages, for Joyride's violations of 15 U.S.C. §§ 1114 and 1125(a), and Joyride's willful violation of 15 U.S.C. § 1125(c); and

ii. An award to Mondelēz of all monetary relief available to Mondelēz under state statutory or common law.

G. An award of Mondelēz's costs and reasonable attorneys' fees, as available under 15 U.S.C. § 1117(a) as an exceptional case, as well as under any state statutory or common law.

H. An award of punitive and nominal damages, as available under any state statutory or common law.

I. An award to Mondelēz of its interest, including pre-judgment and post-judgment interest, on all foregoing sums.

J. Any further relief the Court deems appropriate, just, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Mondelēz hereby demands a trial by jury in this action on all issues triable by jury.

Dated: November 2, 2026

Respectfully submitted,

*/s/ Brianne M. Straka*
Brianne M. Straka
QUINN EMANUEL URQUHART & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401
Email: briannestraka@quinnemanuel.com

Maaren A. Shah (*pro hac vice* forthcoming)
Todd Anten (*pro hac vice* forthcoming)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016
Main: (212) 849-7000
Facsimile: (212) 849-7100
Email: maarenshah@quinnemanuel.com
Email: toddanten@quinnemanuel.com

*Attorneys for Plaintiffs Mondelēz Global LLC and Mondelez Canada Inc.*